UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERSHING PACIFIC WEST, LLC,<br><br>　　　　Plaintiff,<br><br>v.<br><br>FERRETTI GROUP, USA, INC., *et al.*,<br><br>　　　　Defendants. | Case No. 10-cv-1345-L(DHB)<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART MTU GMBH'S MOTION TO DISMISS [DOC. 80]; AND**<br><br>**(2) DENYING FERRETTI AND MARINEMAX'S *EX PARTE* APPLICATION [DOC. 91]** |

　　　On May 24, 2010, Plaintiff Pershing Pacific West, LLC ("Pershing") commenced this action in the San Diego Superior Court against Defendants Ferretti Group, USA, Inc. ("Ferretti"), MarineMax, Inc., and MTU Detroit Diesel, Inc., doing business as Detroit Diesel Corporation ("MTU DD").  About a month later, Ferretti and MarineMax removed this action to federal court.  On April 12, 2012, after receiving leave from the Court, Pershing filed its First Amended Complaint ("FAC") in order to add Defendant MTU Friedrichshafen GmbH ("MTU GmbH") to this action.  MTU GmbH now moves to dismiss.  Pershing opposes.

　　　The Court found this motion suitable for determination on the papers submitted and without oral argument.  *See* Civ. L.R. 7.1(d.1).  (Doc. 83.)  For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** MTU GmbH's motion to dismiss.

## I. BACKGROUND

### A. Sale of the Yacht

On August 22, 2008, Pershing and MarineMax entered into a written Purchase Agreement in which Pershing[1] agreed to buy a 73-foot power boat ("yacht")[2] manufactured by Pershing S.p.A., an Italian corporation wholly owned by the Ferretti Group, for $5,000,000. (FAC ¶ 9, Ex. A.) The yacht was built in 2008 with two new Series 2000 Detroit Diesel engines, separately manufactured by MTU DD and MTU GmbH (collectively, "MTU"). (*Id.* ¶¶ 5, 11.) Pershing alleges that the Purchase Agreement sought to disclaim all warranties and referred Pershing to the manufacturer's warranty. (*Id.* ¶ 10.) At the time of sale, and despite Pershing's request, Defendants each failed to provide the warranties upon which Pershing was directed to rely upon. (*Id.*) Pershing also alleges that "[n]either at the time of sale nor anytime thereafter was [Pershing] provided with the terms and conditions of the warranty." (*Id.*)

Sometime thereafter, Defendants delivered the yacht to Pershing in Fano, Italy. (FAC ¶ 12.) At the time Pershing took delivery of the yacht, and "despite continued representations as to the existence of warranties," Defendants failed to provide Pershing with any warranties. (*Id.*) Rather, Pershing was promised "such warranty information would thereafter be provided." (*Id.*) Pershing alleges that it was not provided with such warranty information, and that it was not given a "reasonable opportunity" to inspect the yacht. (*Id.*)

### B. Allegations of the Yacht's Defective Condition

On September 9, 2008, during the yacht's first trip from Fano, Italy to Croatia, a high fuel temperature warning light activated for the port engine. (FAC ¶ 13.) The next day, the high fuel temperature alarm activated for the same engine again. (*Id.*) After returning to Fano, Italy, the warning could not be reproduced. (*Id.*)

---

[1] Pershing is a limited liability company formed for the purpose of purchasing the yacht, and is wholly owned by Eric B. Benson. (FAC ¶ 1.)

[2] The parties describe the yacht as a 72-foot vessel in their moving papers. However, Pershing alleges that the yacht is 73 feet (FAC ¶ 9).

On December 16, 2008, the yacht was delivered to Port Everglades, Florida. (FAC ¶ 14.) Then, on December 26, 2008, while leaving the Bahamas Islands, another high temperature fuel warning occurred, and the engine failed to come up to a normal cruising speed of 2400 rpms. (*Id.*) Pershing alleges that the engines would not exceed 1800 rpms. (*Id.*)

From September 2008 to the present, MTU, "either directly or through its authorized service representative, has attempted to fix the problems of [the] high fuel temperature to the port diesel engine and the inability of the port diesel engine to reach its normal cruising speed of 2400 rpms." (FAC ¶ 16.) Pershing alleges that the fuel temperature on the port engine has run as high as 40 degrees above the fuel temperature on the starboard engine, exceeding 203 degrees. (*Id.*) Other problems have included a fuel leak from the overflow valve on the port engine on June 29, 2009, and a leak in the fuel pump also in the port engine on June 30, 2009. (*Id.*) The fuel pump has since been replaced, and so has a defective injector. (*Id.*) Fuel line leaks have also been detected at connections on June 27, 2009. (*Id.*)

During the same time period when the problems arose, MTU and its authorized representatives made numerous inspections of the port engine and attempted repairs on more than five different occasions, seeking to resolve the fuel-overheating problem and the port engine's inability to reach regular speeds. (FAC ¶ 17.) Pershing alleges a myriad of detailed repair attempts that occurred at least fourteen times between June 2009 and January 2010. (*Id.*) On March 28, 2010, the yacht sustained another fuel leak in the port engine resulting in the deposit of more than 4 inches of fuel in the main bilge. (*Id.* ¶ 18.) In response, MTU and its authorized representatives again attempted repairs of the engine. (*Id.*)

On April 23, 2010, Pershing's counsel sent a formal correspondence, advising Ferretti, MarineMax, and MTU DD of the "persistent defective condition of the boat and communicated its intent to seek a judicial remedy in the absence of an acceptable response." (FAC ¶ 19; *see also* Compl. Ex. B.) To date, Pershing has not received a response to that correspondence. (FAC ¶ 20.)

On May 2, 2010, the yacht was once again taken out for sea trials. (FAC ¶ 20.) Again, while attempting to bring the yacht up to speed, both the high pressure fuel alarm and fire alarms

sounded. (*Id.*) Ultimately, the yacht was taken back into the port. (*Id.*) As of the date Pershing filed its complaint, the deficiencies associated with the yacht have not been repaired. (*Id.*) In addition to the engine-related problems, the yacht also experienced "persistent and uncured deficiencies" with the Besenzoni System and port Trim Tab. (*Id.* ¶ 21.) These problems also have not been repaired. (*Id.*) Pershing alleges that "[a]s a consequence of the malfunctions . . . [it] has had to repeatedly cancel planned trips and seldom been able to use [the yacht]." (*Id.* ¶ 21.) "[T]he engines have been used in total only about 200 hours, much of which time was spent in sea trials after repairs and for the purpose of determining whether repairs were successful." (*Id.*)

On May 24, 2010, Pershing commenced this action in San Diego Superior Court, alleging causes of action for: (1) revocation of acceptance; (2) rescission; (3) breach of contract; (4) breach of implied warranty of merchantability; (5) negligence; and (6) breach of express warranty. About a month later, Ferretti and MarineMax removed this action to federal court. (Doc. 1.) After obtaining leave from the Court, Pershing filed its FAC on April 12, 2012, alleging the same causes of action, but adding MTU GmbH as a defendant. MTU GmbH now moves to dismiss the FAC under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). (Doc. 80.) Pershing opposes.

## II.   JURISDICTION

When the parties dispute whether personal jurisdiction over a foreign defendant is proper, "the plaintiff bears the burden of establishing that jurisdiction exists." *Rios Props. Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002). In ruling on the motion, the "court may consider evidence presented in affidavits to assist in its determination and may order discovery on the jurisdictional issues." *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). Where the motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make "a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Bryton Purcell LLP v. Recordon & Recordon*, 575 F.3d 981, 985 (9th Cir. 2009). "In determining whether the plaintiff has met this burden, the Court must take the allegations in the

plaintiff's complaint as true and resolve the disputed jurisdictional facts in the plaintiff's favor." *Nissan Motor Co., Ltd. v. Nissan Computer Corp.*, 89 F. Supp. 2d 1154, 1158 (C.D. Cal. 2000) (citing *Ziegler v. Indian River Cnty.*, 64 F.3d 470, 473 (9th Cir. 1995)). A prima facie showing means that "the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant." *Unocal*, 248 F.3d at 922.

"The general rule is that personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). Both the California and federal long-arm statutes require compliance with due-process requirements. Fed. R. Civ. P. 4(k)(2); *Pebble Beach*, 453 F.3d at 1155; *see Holland Am. Line Inc. v. Wärtsilä N. Am., Inc.*, 485 F.3d 150, 161 (9th Cir. 2007).

There are two types of personal jurisdiction: general and specific. General jurisdiction "enables a court to hear cases unrelated to the defendant's forum activities[.]" *Fields v. Sedgewick Assoc. Risks, Ltd.*, 796 F.2d 299, 301 (9th Cir. 1986). Specific jurisdiction allows the court to exercise jurisdiction over a defendant whose forum-related activities gave rise to the action before the court. *See Bancroft & Masters, Inc. v. August Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). The Ninth Circuit employs a three-part test to determine whether the defendant's contacts with the forum state are sufficient to subject it to specific jurisdiction. *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). Under the three-part inquiry, specific jurisdiction exists only if: (1) the out-of-state defendant purposefully availed itself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of the forum's laws; (2) the cause of action arose out of the defendant's forum-related activities; and (3) the exercise of jurisdiction is reasonable. *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1072 (9th Cir. 2001). "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." *Pebble Beach*, 453 F.3d at 1155.

MTU GmbH argues that the Court lacks personal jurisdiction, both general and specific. In response, Pershing argues the contrary, primarily based on MTU GmbH's distribution agreement with Valley Power Systems, Inc. ("VPS") to provide sales and services for MTU

GmbH and others. For the following reasons, the Court finds Pershing meets its burden to establish that the Court has specific jurisdiction over MTU GmbH.

### A.     Purposeful Availment

Under the first prong of the specific-jurisdiction test, the plaintiff must establish that the defendant either purposefully availed themselves of the privilege of conducting activities in California, or purposefully directed their activities toward California. *Schwarzeneggar v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). Although contacts must be more than random, fortuitous, or attenuated, contacts that are "isolated" or "sporadic" may support specific jurisdiction if they create a "substantial connection" with the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 461, 472-73 (1985). "[I]f the defendant directly solicits business in the forum state, the resulting transactions will probably constitute the deliberate transaction of business invoking the benefits of the forum state's laws." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 840 (9th Cir. 1986) (citing *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1331 (9th Cir. 1984) (solicitation of distributorship agreement); *Taubler v. Giraud*, 655 F.2d 991, 994 (9th Cir. 1981) (solicitation of California market by sending of wine samples)). "Similarly, conducting contract negotiations in the forum state will probably qualify as an invocation of the forum law's benefits and protections." *Id.*

MTU GmbH is a wholly-owned subsidiary of Tognum AG, and MTU DD (now known as Tognum America) is a wholly-owned subsidiary of MTU GmbH. (Walton Decl. ¶ 6, Ex. J.) In 2007, Tognum AG entered into a distributor agreement with VPS—expressly on behalf of MTU GmbH—for the express purpose of providing sales and services of MTU GmbH's and other MTU-branded entities' products and parts in California.[3] (Lee Decl. ¶ 6, Ex. A.) VPS is a factory-authorized dealer and distributor for engine, transmission, and equipment manufacturers that is incorporated in California with its principal place of business in the City of Industry,

---

[3] That distributor relationship was renewed in 2012, with MTU GmbH expressly named as an "Affiliated Company" of Tognum AG for which VPS would continue to act as a distributor. (Lee Decl. ¶ 3, Ex. C.)

California. (*Id.* ¶ 3.) The distributor agreements expressly state that they are entered into by Tognum AG as "appointed by MTU Friedrichshafen GmbH" among others. (*Id.* ¶ 5–8, Exs. A–C.) Moreover, the stated purpose of the agreements are "to appoint DISTRIBUTOR as an authorized Distributor (a) to sell and service Products and Parts, [and] (b) to establish the location(s) from which DISTRIBUTOR shall conduct Distributorship Operations." (Lee Decl. Ex. A.) VPS's Area of Responsibility explicitly designates numerous counties in California, including San Diego. (*Id.*) Lastly, the distributor agreements expressly identify the MTU GmbH-manufactured Series 2000 MTU engine—which is the engine that is squarely at issue this action—that VPA is contracted to distribute for MTU GmbH in California. (*Id.*) Based on the foregoing, Pershing argues that MTU GmbH purposefully availed itself of California laws.

MTU GmbH responds to the provided evidence, and the argument that the evidence establishes purposeful availment, simply with: "it was Plaintiff's conduct in bringing the vessel to California and Plaintiff's requests for warranty work which prompted [MTU GmbH's] alleged activity within California." (Def.'s Reply 3:27–4:4.) That statement strongly suggests that MTU GmbH recognizes that it engaged in activities within California. MTU GmbH goes on to conclude that it "did not purposefully come into California and avail itself of California's laws." (*Id.*)

Based on Pershing's overwhelming evidence—in particular, MTU GmbH's distribution arrangement with VPS—the Court concludes that MTU GmbH purposefully availed itself of the privilege of conducting activities in California.[4] *See Schwarzeneggar*, 374 F.3d at 802; *Decker Coal*, 805 F.2d at 840.

### B. Arising Out of Forum-Related Activities

The "arising out of" requirement is met if but for the contacts between the defendant and

---

[4] Pershing also argues that MTU GmbH's alleged negligence within California also renders it subject to personal jurisdiction. (Pl.'s Opp'n 11:26–12:18.) However, MTU GmbH does not address this issue at all in its reply brief. This failure to respond could also be interpreted as concession to Pershing's argument.

the forum state, the cause of action would not have arisen. *See Terracom v. Valley Nat'l Bank*, 49 F.3d 555, 561 (9th Cir. 1995). In other words, the court must determine if the plaintiff would not have been injured "but for" the defendant's conduct directed towards the plaintiff in California. *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998) (citing *Ballard*, 65 F.3d at 1500).

According to Pershing, but for MTU GmbH's distribution and service of its products and parts in California, Pershing would not have claims for breach of implied warranty of merchantability, negligence and breach of express warranty against MTU GmbH. (Pl.'s Opp'n 12:27–13:12.) Additionally, Pershing contends that MTU GmbH expressly warrants the engines on Pershing's yacht, and VPS is obligated to service MTU GmbH's warranties in California through their distributor agreements. (*Id.*) MTU GmbH concedes that the negligence claim potentially arises out of the forum, but also frames the FAC as focusing "on the foreign transaction and any warranties that may have issued thereon." (Def.'s Mot. 5:1–8.) MTU GmbH does not, however, respond to any of Pershing's contentions or even address this second requirement for the specific-jurisdiction analysis in its reply brief.

MTU GmbH fails to provide a particularly compelling analysis for this requirement. After framing the FAC as stated above, MTU GmbH goes on to briefly discuss the merits of Pershing's negligence claim. (Def.'s Mot. 5:3–11.) Presumably, it has chosen this route because it feels that Pershing's inability to sustain a negligence claim would also negate its contention that the claims arise out of forum-related activities. It is worth mentioning again that MTU GmbH's reply brief is completely devoid of any discussion addressing this second requirement for specific jurisdiction. Pershing, on the other hand, provides ample explanation that is consistent with its allegations in the FAC. Notably, Pershing alleges that MTU is a warranter of engine products sold in the United States, and that MTU failed to exercise reasonable care in the diagnosis and repair of the yacht's persistent problems. (FAC ¶¶ 49, 51.) Some, if not most, of the diagnosis and repair attempts were done through MTU GmbH's distributor, VPS, in San Diego, California. (*See* Lee Decl. ¶ 11, Ex. E.) Consequently, the Court concludes that but for MTU GmbH's repeated failures to properly diagnose and repair the yacht's engines, Pershing

would not have sustained injuries to its yacht, which in turn gives rise to various potential claims in California. *See Terracom*, 49 F.3d at 561.

### C. Reasonableness

"Even if the first two requirements are met, in order to satisfy the Due Process Clause, the exercise of personal jurisdiction must be reasonable." *Panavision Int'l*, 141 F.3d at 1322 (citing *Ziegler*, 64 F.3d at 474-75). For jurisdiction to be reasonable, it must comport with "fair play and substantial justice." *Burger King*, 471 U.S. at 476. A district court presumes, however, that its exercise of jurisdiction over a defendant is reasonable if the first two requirements of the specific-jurisdiction test are met. *See Ballard*, 65 F.3d at 1500. If the first two requirements are satisfied, then the burden of proof shifts and the defendant must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* (quoting *Burger King*, 471 U.S. at 477) (internal quotation marks omitted)

Because Pershing has met the first two requirements of the specific-jurisdiction test, the burden now shifts to MTU GmbH to show unreasonableness. *See Ballard*, 65 F.3d at 1500. The following is MTU GmbH's entire argument addressing reasonableness:

> Here, Plaintiff [Pershing] cannot show purposeful availment or any forum related activity by [MTU GmbH] related to the claims at issue. Under these circumstances, it would be unreasonable to require [MTU GmbH], a German corporation, to incur the burden and expense of litigating in this forum when the case arises out of an Italian purchase of a Yacht.

(Def.'s Mot. 5:23–26.) Once again, MTU GmbH's reply brief wholly fails to discuss an important point, this time the final requirement of reasonableness. Effectively, so does MTU GmbH's motion. Therefore, MTU GmbH completely fails to present any compelling consideration that would render jurisdiction unreasonable. *See Ballard*, 65 F.3d at 1500.

### III. LEGAL STANDARD

The court must dismiss a cause of action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The court

must accept all allegations of material fact as true and construe them in light most favorable to the nonmoving party. *Cedars-Sanai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007). Material allegations, even if doubtful in fact, are assumed to be true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, the court need not "necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (internal quotation marks omitted). In fact, the court does not need to accept any legal conclusions as true. *Ashcroft v. Iqbal*, 556 U.S. 662, — , 129 S. Ct. 1937, 1949 (2009)

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). Instead, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).

Generally, courts may not consider material outside the complaint when ruling on a motion to dismiss. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). However, documents specifically identified in the complaint whose authenticity is not questioned by parties may also be considered. *Fecht v. Price Co.*, 70 F.3d 1078, 1080 n.1 (9th Cir. 1995) (superceded by statutes on other grounds). Moreover, the court may consider the full text of those documents, even when the complaint quotes only selected portions. *Id.* It may

also consider material properly subject to judicial notice without converting the motion into one for summary judgment. *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994).

## IV. DISCUSSION

### A. Breach of the Implied Warranty of Merchantability[5]

The California Commercial Codes implies a warranty of merchantability that goods "[a]re fit for ordinary purposes for which such goods are used." *Birdsong v. Apple, Inc.*, 590 F.3d 955, 958 (9th Cir. 2009) (quoting Cal. Com. Code § 2314(2)(c). The implied warranty "provides for a minimum level of quality." *Am. Suzuki Motor Corp. v. Superior Court*, 37 Cal. App. 4th 1291, 1296 (1995) (internal quotation marks omitted). A breach of the warranty of merchantability occurs if the product lacks "even the most basic degree of fitness for ordinary use." *Mocek v. Alfa Leisure, Inc.*, 114 Cal. App. 4th 402, 406 (2003) (citing Cal. Com. Code § 2314(2)).

Under California law, a plaintiff asserting a breach-of-warranty cause of action must stand in vertical contractual privity with the defendant. *Anunziato*, 402 F. Supp. 2d at 1141. A buyer and seller stand in privity if they are in adjoining links of the distribution chain. *Osborne v. Subaru of Am. Inc.*, 198 Cal. App. 3d 646, 656 n.6 (1988). Thus, an end consumer who buys from a retailer is not in privity with a manufacturer. *Id.*

"Courts, however, have recognized an exception to the privity requirement—when a plaintiff pleads that he or she is a third party beneficiary, he or she may assert a claim for the implied warranty's breach." *In re Google Phone Litig.*, No. 10-CV-1177, 2012 WL 3155571, at *9 (N.D. Cal. Aug. 2, 2012) (citing *In re Toyota Motor Corp.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2005). California has codified third-party-beneficiary liability as follows: "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." Cal. Civ. Code § 1559. "Because third party beneficiary status is a

---

[5] "The substantive elements are the same under the Song-Beverly Act and Magnuson-Moss Act." *Birdsong*, 590 F.3d at 958 n.2 (citing Cal. Civ. Code §§ 1791, *et seq.*; 15 U.S.C. § 2301, *et seq.*). "Under both, the court applies state warranty law." *Id.* Furthermore, "the failure to state a claim under state law necessarily constitutes a failure to state a claim under [the MMWA]." *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 832-33 (2006).

matter of contract interpretation, a person seeking to enforce a contract as a third party beneficiary 'must plead a contract which was made expressly for his or her benefit and one in which it clearly appears that he or she was a beneficiary.'" *Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949, 957 (2005).

In addition to the third-party-beneficiary exception to privity, California courts have also articulated other exceptions, such as: (1) reliance on the manufacturer's written representations in labels or advertising materials, (2) cases involving foodstuffs, drugs, and pesticides; and (3) cases involving certain employees who are injured while using dangerous products purchased by their employers. *Windham at Carmel Mountain Ass'n v. Superior Court*, 109 Cal. App. 4th 1162, 1169 (2003); *Fieldstone Co. v. Briggs Plumbing Prods., Inc.*, 54 Cal. App. 4th 357, 369 n.10 (1997).

Pershing alleges that MarineMax "engaged in the sale of pleasure boats," Ferretti "engaged in the business of manufacturing, selling, and repairing pleasure boats," and MTU GmbH "engaged in the manufacture of diesel engines for use in pleasure boats," including the engines for the yacht at issue in this action. (FAC ¶¶ 2, 4, 6.) For all intents and purposes, Pershing is the end consumer, MarineMax is the retailer, Ferretti is the manufacturer of the yacht, and MTU GmbH is the manufacturer of the yacht's engines. Thus, there is no vertical privity in the distribution chain between Pershing and MTU GmbH. Moreover, Pershing fails to cite any law or identify any allegations in the FAC that show that it falls under any of the privity exceptions. *See In re Google Phone Litig.*, 2012 WL 3155571, at *9; *Windham*, 109 Cal. App. 4th at 1169; *Fieldstone*, 54 Cal. App. 4th at 369 n.10. Those same failures apply to Pershing's argument that it has privity with MTU GmbH through the express warranty between the two. (*See* Pl.'s Opp'n 22:9–21.) Consequently, Pershing fails to establish privity with MTU GmbH to sustain its implied-warranty cause of action.[6]  *See Osborne*, 198 Cal. App. 3d at 656 n.6.

---

[6] At least one court has accepted an interpretation of *U.S. Roofing v. Credit Alliance Corp.*, 228 Cal. App. 3d 1431 (1991), that states that "a written contract is not necessary to find vertical privity, rather the degree of interaction and the nature of the relationship of the parties can create the requisite vertical privity." *Torres v. City of Madera*, No. CIVFF02-6385AWLIJO, 2005 WL 1683736, at *15 (E.D. Cal. July 11, 2005). Pershing does not make that argument,

B.   **Breach of Express Warranty**

Pershing asserts its cause of action for breach of express warranty under the MMWA for MTU GmbH's failure to provide the terms and conditions of a written warranty. (FAC ¶ 57.) MTU GmbH challenges the sufficiency of this cause of action on two grounds: (1) the MMWA does not apply to the sale of the yacht and its component parts that were manufactured outside of the country, and delivered and sold in Italy; and (2) MTU GmbH had no obligation to provide a written warranty to Pershing.

1.   **Application of the MMWA**[7]

The MMWA "authorizes a civil suit by a consumer to enforce the terms of an implied or express warranty," and, for the most part, "calls for the application of state written and implied warranty law, not the creation of additional federal law." *Daugherty*, 144 Cal. App. 4th at 833; *see also Milicevic v. Fletcher Jones Imps. Ltd.*, 402 F.3d 912, 918 (9th Cir. 2005). To support its argument that the MMWA does not apply in this case, MTU GmbH directs the Court's attention to the following Code of Federal Regulations interpreting the MMWA:

> The Act covers written warranties on consumer products "distributed in commerce" as that term is defined in section 101(3). Thus, by its terms the Act arguably applies to products exported to foreign jurisdictions. However, the public interest would not be served by the use of Commission resources to enforce the Act with respect to such products. Moreover, the legislative intent to apply the requirements of the Act to such products is not sufficiently clear to justify such an extraordinary result. The Commission does not contemplate the enforcement of the Act with respect to consumer products exported to foreign jurisdictions. Products exported for sale at military post exchanges remain subject to the same enforcement standards as products sold within the United States, its territories and possessions.

16 C.F.R. § 700.1(i). MTU GmbH puts particular emphasis on the statement that "[t]he Commission does not contemplate the enforcement of the Act with respect to consumer products

---

thus the Court does not assess the implied-warranty cause of action under that interpretation of *U.S. Roofing*.

[7] Ferretti and MarineMax filed an *ex parte* application requesting that the Court either reserve its judgment regarding the application of the MMWA and Song-Beverly Act, or limit any ruling to the pleadings. These concerns are irrelevant. Therefore, the Court **DENIES** Ferretti and MarineMax's *ex parte* application. (Doc. 91.)

exported to foreign jurisdictions." *Id.*

MTU GmbH interprets § 700.1(i) as saying that "[l]iability under the MMWA is premised on a sale in the United States." (Def.'s Reply 8:3–4.) No additional law is presented to support that interpretation. That said, the Court is aware of only one case that has discussed the application of the MMWA through § 700.1(i) involving foreign jurisdictions: *Najran Company for General Contracting and Trading v. Fleetwood Enterprises, Inc.*, 659 F. Supp. 1081 (S.D. Ga. 1986). In describing the applicability of the MMWA to "volume sales in a commercial context," the *Najran* court noted that there were "few, if any, significant landmarks pointing out a proper path," and that "[t]he legislative history of the Act offer[ed] little guidance, and case law with respect to this particular aspect of the Act is nonexistent." *Najran*, 659 F. Supp. at 1099 (footnote omitted). Not much has changed since 1986 when *Najran* was issued. Consequently, the Court is left with little guidance other than the language provided in § 700.1(i).

Essentially, MTU GmbH implores the Court to conclude that § 700.1(i)'s language that states that "[t]he Commission does not contemplate the enforcement of the Act with respect to consumer products exported to foreign jurisdictions" is equivalent to the proposition that liability under the MMWA is premised on a sale in the United States. After reviewing the plain language of § 700.1(i), the Court cannot reach that conclusion. Section 700.1(i) applies to consumer products "distributed in commerce," and "products exported to foreign jurisdictions." MTU GmbH fails to show that any product has been exported to a foreign jurisdiction. In fact, the allegations in the complaint suggest the opposite. Setting aside the issue of whether the yacht qualifies as a consumer product, the yacht was manufactured in Italy and then brought *into* the United States. Black's Law Dictionary defines "export" as either "To send or carry abroad" or "To send, take, or carry (a good or commodity) out of the country; to transport (merchandise) from one country to another in the course of trade." Black's Law Dictionary (9th ed. 2009). It also defines "import" as "A product brought into a country from a foreign country where it originated" or "The process of bringing foreign goods into a country." *Id.* The circumstances here would define the yacht as an import rather than an export. Therefore, the Court concludes

14

10cv1345

that MTU GmbH fails to show that the MMWA does not apply here.

### 2.     The Obligation to Provide an Express Warranty

The Code of Federal Regulations also provides guidance as to when written warranties cover consumer products. Specifically, MTU GmbH directs the Court's attention to § 700.3(c), which states that

> The Magnuson–Moss Warranty Act generally applies to written warranties covering consumer products. Many consumer products are covered by warranties which are neither intended for, nor enforceable by, consumers. A common example is a warranty given by a component supplier to a manufacturer of consumer products. (The manufacturer may, in turn, warrant these components to consumers.) The component supplier's warranty is generally given solely to the product manufacturer, and is neither intended to be conveyed to the consumer nor brought to the consumer's attention in connection with the sale. Such warranties are not subject to the Act, since a written warranty under section 101(6) of the Act must become "part of the basis of the bargain between a supplier and a buyer for purposes other than resale." However, the Act applies to a component supplier's warranty in writing which is given to the consumer. An example is a supplier's written warranty to the consumer covering a refrigerator that is sold installed in a boat or recreational vehicle. The supplier of the refrigerator relies on the boat or vehicle assembler to convey the written agreement to the consumer. In this case, the supplier's written warranty is to a consumer, and is covered by the Act.

16 C.F.R. § 700.3(c).

MTU GmbH argues that this section shows that it had no obligation to provide a written warranty to Pershing because it did not manufacture the yacht. (Def.'s Mot. 12:2–20.) Rather, that obligation falls on the retail seller, which MTU GmbH argues is MarineMax. (*Id.*) Pershing responds by emphasizing that this section deals with a "component supplier's warranty [that] is generally given solely to the product manufacturer, and is neither intended to be conveyed to the consumer nor brought to the consumer's attention in connection with the sale." (Pl.'s Opp'n 23:5–17 (quoting 16 C.F.R. § 700.3(c).) Based on that language, Pershing argues that MTU GmbH misapplies § 700.3(c) because it alleges that MTU GmbH's warranty "was not intended to be provided exclusively to the manufacturer (Ferretti) or the seller (MarineMax)." (*Id.* at 23:8–15.) MTU GmbH does not address Pershing's contention in its reply brief. Upon reviewing the FAC, the Court agrees with Pershing.

Pershing alleges that "[a]t the time of sale, Defendant MarineMax represented that warranties were provided by Defendants MTU and Ferretti in conjunction with the sale." (FAC ¶ 43.) Viewing that allegation in light most favorable to Pershing, the Court concludes that Pershing adequately establishes that MarineMax represented to it that MTU GmbH did not intend to provide warranties solely to Ferretti or MarineMax, thereby removing the warranty from the scope of § 700.3(c).

### C. Negligence

The economic loss rule "prevent[s] the law of contract and the law of tort from dissolving one into the other." *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004) (internal quotations marks omitted). The rule generally bars tort actions for contract breaches, thereby limiting contracting parties to contract damages. *Aas v. Superior Court*, 24 Cal. 4th 627, 643 (2000). It precludes recovery for "purely economic loss due to disappointed expectations," unless the plaintiff "can demonstrate harm above and beyond a broken contractual promise." *Robinson Helicopter*, 34 Cal. 4th at 988. In other words, "[a] person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations." *Aas*, 24 Cal. 4th at 643. "[I]n actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone." *Seely v. White Motor Co.*, 63 Cal. 2d 9, 18 (1965).

MTU GmbH argues that Pershing's negligence cause of action is barred by the economic loss rule. (Defs.' Mot. 12:23–14:2.) Specifically, it contends that Pershing's alleged loss is purely economic, and that Pershing fails to allege "that the Yacht's alleged defects, or Defendants' acts and comissions, injured any person or property, or caused non-economic loss of any kind." (*Id.* at 13:24–14:2.) In response, Pershing does not challenge the applicability of the economic loss rule. Rather, it argues that the negligence cause of action is adequately pled because its "damage suffered may be properly attributed to component to component damage resulting from the alleged negligence." (Pl.'s Opp'n 23:18–24:28.) To support its argument, Pershing relies almost exclusively on *Jimenez v. Superior Court*, 29 Cal. 4th 473 (2002).

In *Jimenez*, the California Supreme Court held that a manufacturer of windows installed in a mass-produced home during its construction could be strictly liable in tort for injuries to other parts of the structure in which the defective windows were installed. *Jimenez*, 29 Cal. 4th at 476. The court also emphasized that "the economic loss rule allows a plaintiff to recover in strict products liability in tort when a product defect causes damage to 'other property,' that is, property *other than the product itself*. The law of contractual warranty governs damage to the product itself." *Id.* at 483 (emphasis added). Tort recovery was permissible against the window manufacturer because "California decisional law has long recognized that the economic loss rule does not necessarily bar recovery in tort for damage that a defective product (e.g., a window) causes to other portions of a larger product (e.g., a house) into which the former has been incorporated . . . . '[T]he concept of recoverable physical injury or property damage' ha[s] over time 'expanded to include damage to one part of a product caused by another, defective part.'" *Id.* at 483-84 (quoting *Aas*, 24 Cal. 4th at 641).

To apply the economic loss rule under *Jimenez*, the court "must first determine what the product at issue is." *Jimenez*, 29 Cal. 4th at 483. "Only then do we find out whether the injury is to the product itself (for which recovery is barred by the economic loss rule) or to the property other than the defective product (for which plantiffs may recover in tort)." *Id.* "[D]istinguishing between 'other property' and the defective product itself in a case involving component-to-component damage requires a determination whether the defective part is a sufficiently discrete element of the larger product that it is not reasonable to expect its failure invariably to damage other portions of the finished product." *KB Home v. Superior Court*, 112 Cal. App. 4th 1076, 1087 (2003).

Here, the product at issue is the yacht, which Pershing contends was damaged by the "failure of some of [its] components." (Pl.'s Opp'n 10:25–11:6 (emphasis in original).) To loosely analogize to *Jimenez*, the yacht is the equivalent to the house and the engines are equivalent to the windows. *See Jimenez*, 29 Cal. 4th 483-84. Furthermore, much like *Jimenez*, where the plaintiffs sought recovery from the window manufacturer, Pershing seeks recovery from the engine manufacturer MTU GmbH for damage to the yacht caused by components that it

manufactured (the engines). That said, as MTU GmbH points out, Pershing fails to allege facts that show any component-to-component damage in the FAC. Therefore, Pershing inadequately pleads its negligence cause of action. *See Twombly*, 550 U.S. at 555.

## V. CONCLUSION & ORDER

In light of the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** MTU GmbH's motion to dismiss. Specifically, the Court:

(1) **DENIES** the motion to dismiss brought under Rule 12(b)(2);

(2) **GRANTS WITH LEAVE TO AMEND** the motion to dismiss as to the causes of action for negligence and breach of the implied warranty of merchantability; and

(3) **DENIES** the motion to dismiss as to the cause of action for breach of express warranty.

If Pershing chooses to amend either of its causes of action for negligence or breach of the implied warranty of merchantability, it must do so by **February 7, 2013**. Additionally, the Court also **DENIES** Ferretti and MarineMax's *ex parte* application.

**IT IS SO ORDERED.**

DATED: January 24, 2013

M. James Lorenz
United States District Court Judge

COPY TO:

HON. DAVID H. BARTICK
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL